Robert A. REED, et al., Plaintiffs,

v.

James A. RHODES, et al., Defendants.

No. 1:73 CV 1300.

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 1, 1996.

**1486**

Thomas I. Atkins, Brooklyn, NY, James L. Hardiman, Cleveland, Ohio, David W. Whitaker, Beachwood, Ohio, for Plaintiffs.

Wanda Rembert Arnold, Cleveland Board of Education, Law Department, Cleveland, Ohio, for Local Defendants.

Stephen M. O'Bryan, Margaret Anne Cannon, Kelley, McCann & Livingston, Cleveland, Ohio, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for State Defendants.

### ORDER

KRUPANSKY, Circuit Judge, Sitting by Designation.

In considering the Motion to Vacate and Rescind Receivership Order filed by Thomas I. Atkins, Esq. (Atkins), 135 Eastern Parkway, Suite 11–B–1, Brooklyn, New York, 11233, one of the attorneys of record for the plaintiffs in this class desegregation action, the Court notes, as it did in denying Atkins' contemporaneously filed Motion to Recuse, Pursuant to 28 U.S.C. § 455(a), that receivership, pursuant to Ohio Revised Code § 3313.483 *et seq.*, is an option reserved to the discretion of the State Board of Education upon certification by the State Auditor.

Accordingly, the Court will consider the Atkins pleading as a motion to vacate its March 3, 1995 Order directing the State Board of Education, by and through its Superintendent of Public Instruction, to assume and exercise the authority and responsibility invested in it by the Ohio Constitution, its duly-enacted statutes, and the Court's various desegregation orders and consent decrees dating from 5/16/79.

The instant motion, like its contemporaneously filed Motion for Recusal Pursuant to 28 U.S.C. § 455(a), is a rhetorical discourse of factually unsupported opinions, conclusory assertions, and misstatements, without legal substance or precedent, which counsel knew or should have known "after an inquiry, reasonable under the circumstances," Rule 11(b) of the Federal Rules of Civil Procedure, to be self-discrediting hearsay, conjecture, and editorialized journalistic commentary and speculation.[1]

In an effort to avoid repetition, the prologue in the Court's Order denying the Atkins recusal motion is incorporated in this disposition and made a part hereof.

Addressing the sections of the Motion to Vacate *seriatim,* the Court finds:

Section 1: "Consent Decree Provisions Made the March 3, 1995 Order Unnecessary."

The necessity for the March 3, 1995 Order, and its possible impact, if any, upon the consent decree of May 24, 1995 were factual and legal arguments that could have been, but were not, joined and addressed by plaintiffs' counsel James L. Hardiman (Hardiman), at the February 24, 1995 court hearing that resulted in the March 3, 1995 Order (Atkins was not present). Plaintiffs' multiple counsel entered no formal or informal objections to the March 3 Order, nor did they timely invoke or pursue, any of the many post judgment procedures available to them before the district court to correct a purportedly erroneous judicial resolution or disposition. Plaintiffs' multiple counsel, including Atkins, ignored, and failed to timely invoke or pursue, any of the available multiple appellate procedures designed to correct purportedly erroneous resolutions or decisions of a trial court. Accordingly, the allegations of section 1 of the Motion to Vacate are unsupported by fact and without legal merit.

---

1. A review of Plaintiffs' Application for Fees and Costs of Thomas I. Atkins filed on September 15, 1995 reflects that Atkins has visited the Cleveland area but on two occasions during the fifteen months of this Court's stewardship of the late Judge Frank J. Battisti's docket which began in October of 1994. Apart from his attendance at a single court hearing on November 10, 1994 and a conference between various state school board administrative personnel and their legal counsel on April 4, 1995, his participation in this desegregation proceeding has been limited exclusively to long distance teleconferencing from his apartment in Brooklyn, New York with his local co-counsel, other involved lawyers and individuals—a practice which manifests the hearsay characteristics of his information sources.

Section 2. "The Receivership [sic] March 3, 1995 Order Has Reduced Essential Public Support."

Needless to say, the Court appreciates that a lack of community confidence in the School System's performance is a malignant condition. It would be the first to encourage and solicit the entire community to join and assist Dr. Boyd in his efforts to restore the System's financial and management capabilities, without which support Dr. Boyd's pledged efforts to achieve the highest level of qualitative student education will be materially jeopardized.

As legal counsel residing in Brooklyn, New York, perhaps Atkins may be less sensitive to Cleveland *COMMUNITY-WIDE* objective expressions of attitude, as reflected on May 3 and November 8, 1994, when the electorate of the city demonstrated a lack of confidence in the three-year pre-election performance of the Cleveland Board of Education by defeating two of its successively sponsored school operating levies by a 3 to 2 margin. This community-wide objective manifestation of no confidence occurred some ten months before the State Board of Education and Drs. Sanders and Boyd assumed the task of restoring the financial and management capabilities of a school system in disarray.

To suggest that the efforts of the State Board of Education and Dr. Boyd have been and are without effect, as Atkins implies, reflects a misunderstanding and lack of appreciation of the magnitude and depth of the predicament confronting the Cleveland School District. To expect Dr. Boyd to correct the System's financial and management difficulties and restore community-wide confidence in a decimated system within ten short months defies logic.

As suggested in the first draft plan developed by the McKinsey Group, a highly-reputable firm of financial and management consultants, styled a Blueprint to Improve Student Performance and Achieve Financial Stability released in November of 1995, the rehabilitation period will be tedious, complicated, and long-range.

During the ten months of the State's administration of the Cleveland School District, significant action has been initiated to restore the system's financial and management capabilities. These efforts are reflected by material affirmative results, as summarized in the State Defendants' Brief in Opposition to Plaintiffs' Motion to Vacate and Rescind Receivership Order, p. 6:

—The smoothest school opening in recent history occurred in September, 1995, despite the closing of eleven schools, relocation of equipment, and reassignment of hundreds of staff and thousands of students;

—The curriculum was realigned for consistency with proficiency test objectives;

—New achievement standards were set for each grade level;

—New programs were implemented to enhance math and science instruction (NSF–Urban Systemic Initiative);

—Faculty inservicing was targeted on proficiency strategies;

—More proficiency intervention began with high school students;

—224 personnel positions were eliminated, saving approximately $9.8 million for FY 1996. Other cost reductions saved $2.2 million. These savings will total more than $12 million annually;

—Medicaid reimbursements will increase more than 300%;

—Reductions in legal fees will save more than $500,000 in FY 1995–96;

—Monthly meetings have taken place concerning compliance with extant remedial orders involving the Plaintiffs and State and District personnel;

—A position control system is being implemented;

—New agreements were made to maximize purchasing power and reduce costs. Joining the Self–Help Gas Program, with estimated savings of $100,000 for the first year, will produce increased savings in subsequent years;

—Eleven schools and one administrative site were closed;

—More and better technology services were provided by loaned executives;

—Transportation savings were found of approximately $500,000 in FY 1995–96. Transportation for high school students residing more than 4 miles from school, and payment in lieu for non-public high school students, was reinstated;

—A Bruening Foundation grant was used for a pilot program of video cameras on buses to enhance safety and monitor conduct;

—Comprehensive attendance sweeps were conducted to enforce the daytime curfew. District-wide random metal detector sweeps were conducted at all secondary schools. Over 2,000 walking routes and 22,000 streets were evaluated to identify potential hazards and safe walking paths to elementary schools;

—Fifteen properties were offered for sale at public auction; and

—The Honeywell project plus structured maintenance of heating systems resulted in fewer major heating problems this winter.

As the state defendants note in their brief, these positive changes were made possible by the March 3, 1995 order which permitted state professionals to provide new impetus for the District's leadership. Accordingly, the allegations of Section 2 of the Motion to Vacate are without factual support or legal credibility.

Section 3. "The Receivership [sic] March 3, 1995 Order Has Distorted Consent Decree Implementation."

The allegations of Section 3 are essentially the same as those asserted in section 2 and are predicated upon factually unsupported personal perceptions and opinions of Atkins and are without legal credibility.

Section 4: "The Receivership [sic] March 3, 1995 Order Has Had Harsh Effects."

Atkins asserts that the Cleveland Board of Education, as constituted in 1994 and 1995, was deprived of its legal counsel of choice "by decisions Plaintiffs believe had their origin with the Presiding Judge."

The Court is not familiar with the decisions alluded to or the identity of the individual or individuals to whom the decisions are attributed.

The Court was notified by letters from the Cleveland Board of Education's General Counsel dated September 18 and 22, 1995, and by a court filing entered on October 16, 1995, that Fred Nance and his firm Squire, Sanders and Dempsey of Cleveland, and Maree Sneed and her Washington, D.C. law firm of Hogan & Hartson, would no longer be special counsel of record representing the Cleveland School Board in *Reed v. Rhodes.* No explanation was referenced in the letters. To this date, the Court is unaware of the reasons for General Counsel's decision, never having discussed this or any other subject with Ms. Arnold.

The Court has been informally advised (but is without formal notice) that the Cleveland law firm of Teamor, Thompson & Associates was dissolved and disbanded and Ricardo B. Teamor was not retained as Special Counsel to the Board.

However, incidental to a review of provider and service contracts of questionable validity involving multi millions of dollars that were authorized by the Cleveland Board of Education after the March 3, 1995 Court Order without approval or ratification by the State Board of Education or its Superintendent of Instruction, General Counsel for the local board was noticed that a contract retaining the part time services of a former partner in Teamor, Thompson & Associates, specifying no job description or minimum weekly, monthly, or hourly time commitment at a questionable annual fee of $150,000.00 pay-

able in monthly $12,500.00 installments, was void. His services were discontinued.

Whether the named law firms and/or individual legal counsel voluntarily withdrew their services in *Reed v. Rhodes,* or were terminated for whatever reason, was a professional lawyer-client relationship decision between General Counsel and the respective law firms and/or lawyers into which relationship the Court had no inclination to, or did, intrude.

During the course of the proceeding in this desegregation case, the Court's interest was piqued by the purported need for the multiple law firms appearing of record on behalf of the defendant local school board. Mindful of the board's debt-ridden and insolvent condition, and recognizing that every dollar paid from taxpayers' revenues as excessive legal fees was being diverted from educating the district's student enrollment and was materially impairing the Court's implementation of its various Court orders and consent decrees, the Court requested the Office on School Monitoring and Community Relations (OSMCR) to provide a comparative analysis of fee payments to local defendants, state, and plaintiffs' special counsels in *Reed v. Rhodes.* The cursory survey disclosed wide disparities.

When the local school board's General Counsel balked at OSMCR's request to produce 1993–94 Special Counsel billing records for an in-camera inspection, claiming workproduct privilege, the Court issued a show cause contempt order. The Court honored Fred Nance's request to conduct the hearing in-camera. The hearing was routine and uneventful. General Counsel for the local school board, to the Court's recollection, apologized and agreed to produce the requested billing records. The hearing was stenographically transcribed.

An examination of billing records disclosed that, during the fiscal year 1993–94, the Cleveland Board of Education paid, without objection, fee schedules submitted by Squire, Sanders & Dempsey in the amount of $376,-156.81, Hogan & Hartson of Washington, D.C.—$280,580.46, and Teamor, Thompson & Associates—$258,522.89, for a total of $915,-260.16 (from the Office on School Monitoring and Community Relations calculations). The above aggregate payments were approximately three times greater (or 300% more) than the fees paid to plaintiffs' legal counsel, or those paid to the State Board of Education's legal counsel, for addressing the same issues and controversies arising during the same time period. The propriety of those disparate fees will, in all probability, be determined by the State Auditor's performance audit.

The safety and security of students, certified and uncertified personnel, public property and facilities within the Cleveland School District have been a matter of continuing public apprehension of which a desegregation court may take judicial notice.

In an effort to determine the scope and causes of safety and security concerns of parents, students, and teachers, and the community generally, the Court appointed Thomas J. Bader, a retired Special Agent of the Federal Bureau of Investigation, as Administrator of Safety and Security for the Cleveland School District (Appendix A) to conduct a survey and submit a report and recommendations for improving the safety and security within the system. The survey has been ongoing with the cooperation of Dr. Boyd, the State Deputy of Public Instruction. Bader's efforts have been exhaustive. He has interviewed principals, teachers, the president of the teachers' union, school security personnel, loaned corporate executives, local and federal law enforcement personnel, and knowledgeable professional student sociologists familiar with the Cleveland school student enrollment. He and Dr. Boyd are in the process of finalizing a comprehensive training program designed to improve overall safety and security within the system. The Court assigns no "harsh" connotations to this unilateral action.

Lastly, the Court has not enjoined or interfered with the Board of Education's conduct of public meetings. Board members, either individually or collectively, have always been free to express opinions without reservation. A voluntary waiver of any rights of free expression is self-induced and a matter of individual choice. Similarly, the

decision of any school board member to resign or not seek re-election is and was a decision of personal choice and the exercise of individual discretion.

Like the allegations of Sections 1, 2, and 3 of the instant Motion to Vacate, section 4 and its component subsections derive from factually-unsupported hearsay, perceptions, and opinions expressed by Atkins that are without legal credibility.

As a threshold observation, it should be noted that Atkins has failed to identify the legal basis for the motion to vacate the March 3, 1995 Order, perhaps in an effort to divert attention from his failure to pursue timely available legal remedies.

Plaintiffs' multiple legal counsel have failed to initiate or pursue timely available district court post judgment relief, or equally available appellate review, of the March 3, 1995 Order, either as a final appealable order pursuant to Fed.R.App.P. 4 which mandates the filing of an appeal within 30 days of an order, or as an interlocutory appeal under 28 U.S.C. § 1292(a)(1). The Sixth Circuit has ruled that "parties may not use a Rule 60(b) motion as a substitute for an appeal." *Hopper v. Euclid Manor Nursing Home, Inc.,* 867 F.2d 291, 293 (6th Cir.1989).

Moreover, Rule 60(b) requires that any motion to vacate a judgment be brought within a reasonable time after it has been entered. The lengthy ten-month delay in filing the instant motion, coupled with the upcoming trial of the state and local school board's joint Motion for Declaration of Partial Unitary Status for the Student Assignment Component of the Remedial Orders, and Modification of the Consent Decree scheduled to commence on February 7, 1996, and the recent orders of this Court questioning plaintiffs' counsel's petitions for fee awards which were, at the election of plaintiffs' counsel, ordered to be reassessed and resubmitted for final disposition on January 31, 1996, brings into issue the good faith and motivation of the movant, as does the total absence of any legal precedent supporting the arguments advanced by Atkins.[2]

On its merits, Atkins' motion fails to allege a single "exceptional or extraordinary circumstance" which was unforeseen at the time the March 3, 1995 Order issued. *Olle, Jr. v. Henry & Wright Corporation,* 910 F.2d 357, 365 (6th Cir.1990); *Hopper,* 867 F.2d at 293. Having reviewed Atkins' hearsay and speculative complaints about "negative publicity" or "harsh effects" of the State's stewardship, and for the reasons stated herein, the Court concludes that Atkins has alleged no change of circumstance which would justify modifying or vacating the March 3, 1995 Order.

Lastly, the Court notes that neither James L. Hardiman nor David W. Whitaker, plaintiff's Cleveland co-counsel, have signed either the Motion to Recuse or the Motion to Vacate filed by Thomas I. Atkins.

Accordingly, the motion to vacate is DENIED.

IT IS SO ORDERED.

## APPENDIX A

### UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO EASTERN DIVISION

[Filed June 1, 1995]

*ORDER*

KRUPANSKY, Circuit Judge, Sitting by Designation.

IT IS ORDERED that Thomas J. Bader is hereby appointed as a consultant for the Office on School Monitoring and Community Relations with the title of Administrator of Safety and Security for the Cleveland Public School System for a period of twelve (12) months commencing May 1, 1995.

As the Administrator of Safety and Security for the Cleveland Public School System, he shall conduct a survey and evaluation of existing safety and security measures and all matters incidental thereto presently in place within the said school system. He shall, upon completion of his survey and evaluation, formulate and present to the Office on School Monitoring and Community Relations comments and recommendations for the imple-

---

**2.** *See* Local Rule 8:8.1(c), which requires "that a moving party *SHALL* serve and file with its mo- tion a memorandum of points and authorities on which it relies in support of its motion."

mentation of a safety and security program designed to ensure the safety and security of students, administrative and teaching personnel utilizing the facilities of the Cleveland Public School System.

The Board of Education for the Cleveland School District, the State Deputy Superintendent of Schools and their professional, executive, and other personnel, shall extend their cooperation and support in all ways necessary to permit and facilitate the assignment of the Administrator of Safety and Security without direct or indirect interference with his implementation of this Order.

IT IS SO ORDERED.

Dated: *nunc pro tunc* to May 1, 1995

### RESUME

Thomas J. Bader
14801 Armin Ave.
Lakewood, Ohio 44107

**Education:**

1948–52 B.S. Degree
John Carroll University
University Heights, Ohio

1952–56 LLB Degree
Cleveland Marshall Law School
Cleveland, Ohio

**Employment:**

**1956–79**
Special Agent, Federal Bureau of Investigation

I investigated a variety of criminal and civil cases in different areas of the country. I was present during the integration of Central High School in Little Rock, Arkansas in 1957 and was heavily involved in the FBI's efforts to insure that this process was orderly and that any violations of the law were quickly and impartially investigated.

For about a year in 1965–66 I was assigned to Washington D.C. and worked for the Appropriations Committee of the United States House of Representatives. A staff of FBI agents and other experts in their fields conducted in-depth studies across the United States at the direction of the committee to assist them in making decisions on whether to appropriate money for various programs.

As a supervisory special agent I directed the activities of a large number of agents investigating the murder of Joseph Yablonski, his wife and daughter in 1969. Yablonski was a candidate for President of the United Mine Workers union and the investigation, which went on for some years, resulted in the conviction of the actual triggerman, the go-betweens and ultimately, the President of the United Mine Workers, Tony Boyle.

I also directed the activities of a large contingent of agents in Cleveland when schools in the Cleveland system were integrated and school busing began. This required careful planning and extensive coordination with the Cleveland Police Department and others so that any disruption of the program would be kept to a minimum.

Since 1962 I have lectured extensively to FBI agents, law enforcement officers and private security practitioners on legal issues such as search and seizure, laws of arrest, interrogation, civil liability, use of force and other legal aspects of private security. I have testified as an expert witness in some of these areas just mentioned.

**1979–90**
Senior Security Advisor, Cleveland Electric Illuminating Company

I formed a new security element at CEI and managed the activities of a staff of investigators and support personnel. I instituted security programs such as pre-employment screening, identification badges for employees, visitor access and control, crime prevention and security surveys of generating plants and service centers. The security surveys included evaluation of the performance of security officers, use of cameras, access control and security of company property and employees.

I also supervised investigations of theft of company property, fraud, sexual harassment, theft of energy, drug related incidents and other internal security matters.

**1991–92**
Center for Criminal Justice, Case Western Reserve

**1492**

University Law School,
Program Coordinator/Lecturer

I set up advanced seminars for law enforcement officials and frequently lectured at these seminars on current legal issues facing law enforcement.

**1993–Present**
Federal Bureau of Investigation
Independent Contractor

I conduct background investigations on applicants seeking Government employment

Director of Investigative Services,
United Security Management Services, Inc.

I conduct investigations for corporate clients in areas such as theft, fraud, internal security violations and pre-employment screening.